508 So.2d 372 (1987)
LAKE PLACID HOLDING CO., a Florida Corporation, and August Tobler, Appellants,
v.
Elissa Landi PAPARONE, Appellee.
No. 86-301.
District Court of Appeal of Florida, Second District.
February 27, 1987.
Rehearings and Rehearings Denied May 7, 1987.
Rehearings and Rehearings Denied May 19, 1987.
*374 A.H. Lane of Lane, Trohn, Clarke, Bertrand & Williams, P.A., Lakeland, for appellants.
Gerald F. Richman and Bertha Claire Lee of Floyd Pearson Richman Greer Weil Zack & Brumbaugh, P.A., Miami, and William C. Hearon of Law Offices of William C. Hearon, Miami, for appellee.
Rehearings and Rehearings En Banc Denied May 7, 1987.
Rehearings and Rehearings En Banc Denied May 19, 1987.
FRANK, Judge.
The instant proceeding represents the fourth occasion offering us an opportunity to examine and resolve disputes involving Elissa Landi Paparone arising from transactions associated with land owned by the Lake Placid Holding Company (LPHC). Lake Placid Holding Co. v. Paparone, 414 So.2d 564 (Fla. 2d DCA 1982) [Paparone I] (directing the discharge of a lis pendens filed by Paparone), Paparone v. Lake Placid Holding Co., 438 So.2d 155 (Fla. 2d DCA 1983) [Paparone II] (reversing summary judgments entered in favor of Bankers Life & Casualty Company and Lake Placid Holding Company), and Paparone v. Bankers Life & Casualty Company, et al., 496 So.2d 865 (Fla. 2d DCA 1986) [Paparone III] (ordering summary judgment in favor of Bankers upon remand). The issues now confronting us stem from the pleaded backdrop contained in our prior opinions and the facts most recently developed in a trial. The entire factual setting may be summarized as follows:
LPHC entered into an agreement to sell certain land to Gulfstream Citrus, Inc.[1] The agreement was subsequently assigned to Placid Lakes Corporation which intended to develop the property under the management of Magna Properties, Inc. Bankers, acting through Placid Lakes, in addition to making a cash payment of $1,157,868.00 at closing, assumed and satisfied several mortgages totalling $1,927,159.00, which had been created by LPHC, and agreed in a profits participation agreement (PPA) to develop and sell the property. Placid Lakes further agreed in the PPA to pay LPHC twenty-five percent of the pretax profits originating in the development and sale of the property encompassing some 3,300 acres.
Paparone, the former spouse of August Tobler who controlled LPHC, was the real estate broker involved with the sale of the land to Placid Lakes. Her status as the broker was formed by letters dated August 25, 1975, and September 10, 1975, executed on behalf of LPHC by Tobler. LPHC agreed to and did pay her an initial real estate commission in the amount of $20,000; it also promised to pay a sum equal to fifty percent of any monies received by LPHC under the terms of the PPA.
When it became evident after a substantial period following entry into the PPA that Placid Lakes was not going to fulfill its obligation to develop and sell the property, LPHC filed an action in April of 1979 seeking damages, specific performance, and the foreclosure of a vendor's lien. After lengthy negotiations between LPHC and the Bankers-Placid Lakes-Magna group, a settlement was reached; LPHC reacquired the property free and clear by a *375 deed from Placid Lakes in lieu of foreclosure, and the parties bilaterally indemnified each other against future claims. Paparone intervened in the litigation on May 11, 1981, one day before the litigation was compromised, claiming entitlement from Bankers to a portion of the alleged damages. In one count of her complaint in intervention Paparone alleged that LPHC and Bankers, with full knowledge of her rights and her pending motion to intervene, wilfully and maliciously conspired to defraud and defeat her interest in the PPA by settling the litigation and in transferring the subject property through a deed granted in exchange for not foreclosing the vendor's lien.
The deed in lieu of foreclosure was executed and recorded in accordance with the agreement, and LPHC dismissed its action against Bankers.[2] LPHC then filed a cross-claim against Paparone for declaratory relief. Paparone filed an answer, affirmative defenses, and a cross-claim, subsequently amended, against Bankers, Placid Lakes and Magna. All parties also filed motions for summary judgment. The trial court granted the motions filed by LPHC, Bankers, Lake Placid, and Magna finding no genuine issue of material fact. It found that Paparone's claim for a brokerage commission was limited to a particular fund, i.e., the profits to be received by LPHC under the PPA, but because the fund never materialized, she was not entitled to a commission. The trial court further held that Paparone had no right to a commission, hence there was no basis for her contention that she was defrauded by the parties. Accordingly, Paparone's motion for summary judgment was denied, and her complaint in intervention and her cross-claim were dismissed with prejudice.
Paparone appealed from the denial of her motion for summary judgment, the dismissal of her intervenor's complaint and the dismissal of her cross-claim. We affirmed the denial of her motion for summary judgment but we reversed the granting of summary judgment rendered in favor of LPHC, Bankers, Placid Lakes and Magna, the dismissal of her complaint in intervention and her cross-claim. Paparone II. We concluded in that proceeding that:
[A] material issue of fact exists as to whether or not the fund was created by the substitution of the land for the money. If that issue of fact is resolved against Paparone, and the trier of fact determines that the fund was never created, it will still be necessary to determine whether the creation of the fund was prevented by the unreasonable refusal to act, or some other wrongful action attributable to the appellees.
438 So.2d 157.
A trial was conducted following remand and the jury returned a special verdict finding that:
1. A fund was created by the substitution of the land for the money which could have been recovered by LPHC from Bankers in the lawsuit which was settled;
2. LPHC defrauded Paparone;
3. LPHC breached its fiduciary duty to Paparone;
4. Tobler breached his fiduciary duty to Paparone;
5. Paparone was entitled to compensatory damages in the amount of $300,000.00;
6. Paparone was entitled to punitive damages from LPHC in the amount of $1,312,000.00;
7. Paparone was entitled to punitive damages from August Tobler in the amount of $500,000.00.
An amended final judgment was entered, incorporating the special verdict, in which the trial court in the exercise of its declaratory judgment powers, inter alia, conferred ownership in Paparone to an undivided one-half interest as a tenant in common with LPHC in the property situated in Highlands County, such property having been found by the trial court to be free *376 from any encumbrance except for certain leases. LPHC was also permanently enjoined from any action impairing a free, clear and unencumbered title in Paparone of her undivided one-half interest in the property. The trial court also imposed a constructive trust upon one-half of all funds or other property received by LPHC arising from its ownership or operation of the property.
LPHC and Tobler have appealed from the amended final judgment urging reversal based upon four major and thirteen subsumed issues. We have reviewed the transcript of testimony, the exhibits in their entirety which have been brought to us, and we have analyzed each of the issues framed by LPHC and Tobler; we have concluded that the only meritorious contentions focus on the fraud and breach of fiduciary duty verdicts and the resultant award of punitive damages. We reverse and vacate those aspects of the amended final judgment.
Paparone's present claims, no differently from the three prior instances when this litigation was before us, derive from "nothing other than a contract for a real estate broker's fee." Paparone I and III.
We begin our consideration of this matter again stating that we will not sustain an award of punitive damages for the breach of a contract save in the circumstance where the conduct producing the breach is itself endowed with the characteristics of an independent, actionable tort. Porter v. Wilson, Walch, Fortner, Robinson & Besse, 384 So.2d 190 (Fla. 2d DCA 1980). Indeed, even "a `flagrant breach of contract' will not support punitive damages." G.M. Brod & Co. Inc. v. U.S. Home Corporation, 759 F.2d 1526, 1536 (11th Cir.1985). The proof which must be developed in order to warrant the award of punitive damages in the context of a breach of contract must rise to a level revealing malice, moral turpitude, wantonness "conceived in the spirit of mischief or criminal indifference to civil obligations." Genesis Publications, Inc. v. Goss, 437 So.2d 169 (Fla. 3d DCA 1983). We have examined the record in a light most favorable to Paparone to determine if competent substantial evidence supports the findings that LPHC and Tobler defrauded and breached a fiduciary duty owed to her. See Clover Interior Systems, Inc. v. General Development Corp., 357 So.2d 459, 460 (Fla. 2d DCA 1978). We are unable to distill that quality of evidence permitting a finding that the behavior of LPHC and Tobler justified the recovery of punitive damages. See Potashnick-Badgett Dredging, Inc. v. Whitfield, 269 So.2d 36, 43 (Fla. 4th DCA 1972).
In reversing the punitive damage awards, we are not unmindful of the role of the jury in determining whether fraudulent conduct and breach of a fiduciary duty warrant the imposition of such damages. See, e.g., Walsh v. Alfidi, 448 So.2d 1084 (Fla. 1st DCA 1984). The error we have found, however, does no violence to the jury's function. The question of whether the evidence described a legal basis for the recovery of punitive damages was for the trial court to determine upon the motions of Tobler and LPHC for directed verdicts prior to submission to the jury. Wackenhut Corp. v. Canty, 359 So.2d 430 (Fla. 1978). In our view, more fully explicated below, the trial court erred in permitting the jury to evaluate the evidence offered in support of the alleged wrongdoing and to assess punitive damages.
We do not gainsay that evidence can be found in the record indicating that Tobler harbored ill will toward Paparone as an outgrowth of her precipitous departure from the marital home and the termination of their marriage. Whatever the degree of Tobler's enmity toward Paparone, however, his motivation, and hence LPHC's, in seeking to oust her of the commission she had contracted to receive cannot serve as a basis for the award of punitive damages. Lewis v. Guthartz, 428 So.2d 222, 223 (Fla. 1982). Indeed, even if the record were manifestly to disclose, which we find it does not, that Tobler and LPHC "acted intentionally, willfully and outrageously" to breach Paparone's commission agreement, such evidence would "not by itself create a tort where a tort otherwise does *377 not exist." Id. at 224. The alleged fraud and breach of fiduciary duty attributed to Tobler and LPHC "arose from the same conduct which [constituted] a breach of contract." Taylor v. Kenco Chemical & Mfg. Corp., 465 So.2d 581, 590 (Fla. 1st DCA 1985). It is no less certain that a fraud "cannot be predicated solely upon the failure to perform a promise." Century Properties, Inc. v. Machtinger, 448 So.2d 570, 572 (Fla. 2d DCA 1984). Based upon the present record, we can readily eliminate the exception to the latter principle  "a promise may be a basis for fraud where there is evidence the promisor (sic) had a specific intent not to perform at the time the promise was made." Id. at 572-573. There is no evidence indicating that Tobler had formed an intention to deprive Paparone of a commission at the moment the commission agreement was executed.
There is also no question that after purchasing the property from LPHC, Bankers became disenchanted with the transaction. Apart from the construction of a few roadways, Bankers undertook little activity toward the achievement of the contemplated objectives. It was Bankers' lassitude in advancing the project that caused Tobler to become unhappy with the arrangement and ultimately to file a lawsuit against the Bankers group. During the pendency of that action there were joint efforts to reach a settlement. Bankers, too, "wanted out."
At the heart of Paparone's claim is the convoluted notion that reconveyance of the property to LPHC by a deed in lieu of foreclosure was a scheme fabricated to pretermit the existence of funds exposed to the payment of her commission and that characterizing LPHC's interest as a foreclosable vendor's lien was an artifice essential to that end. We turn to an analysis of this aspect of the evidence.
Paparone sought at trial factually to bolster her position that the nonquantifiable benefits which were to flow to LPHC from the PPA vitiated any possibility that a vendor's lien existed. Paparone's proof in this regard consisted of the testimony of two attorneys each of whom stated that the vendor's lien was unenforceable for the reason that the PPA does not specify a sum to be paid to LPHC.
Although there may be some question as to the appropriateness of permitting Paparone's attorney-witnesses to testify to a matter which seems to involve only a question of law, we cannot agree that the reference to a vendor's lien in the Bankers-LPHC settlement agreement was a deceitful attempt to avoid the amassing of money unshielded from Paparone's commission demand. Wholly distinct from any possibility of error in permitting testimony as to the legal components of a vendor's lien, we disagree with the testimonial definitions offered by Paparone's attorney-witnesses. In the circumstances before us, it cannot be said, as we show below, that asserting a vendor's lien was an implausible approach to the problem confronting Tobler and LPHC.
A vendor's lien is nothing more than an equitable lien. Special Tax School District No. 1 of Orange County v. Hillman, 131 Fla. 725, 179 So. 805 (1938). An equitable lien arises from a contract disclosing an intention to charge some particular property with an obligation and a court determines the equities out of a general consideration of right and justice as applied to the relations of the parties and the circumstances of their dealing. Wagner v. Roberts, 320 So.2d 408 (Fla. 2d DCA 1975); see also Architectonics, Inc. v. Salem-American Venture, 350 So.2d 581 (Fla. 2d DCA 1977). We have found no authority confirming the correctness of Paparone's witnesses' perception that a vendor's lien is dependent upon a contractually liquidated sum. We have defined a vendor's or equitable lien as:
[N]ot an estate or property in the land itself nor a possessory right of any kind. It is a charge or encumbrance upon the land "so that the very thing itself may be proceeded against in an equitable action, and either sold or sequestered under a judicial decree, and its proceeds in the one case, or its rents and profits in the other, applied upon the demand of the creditor in whose favor the lien exists." Davidson v. S.S. Jacobs Company, Fla. *378 1957, 93 So.2d 731; Jones v. Carpenter, 1925, 90 Fla. 407, 106 So. 127, 129, 43 A.L.R. 1409. Equitable liens may arise, by operation of law from the conduct of the parties, from a variety of transactions to which equity will cause them to attach. Dewing v. Davis, Fla.App. 1960, 117 So.2d 747.
Phelps v. Higgins, 120 So.2d 633, 635 (Fla. 2d DCA 1960). Indeed, if "[e]quitable liens become necessary on account of the absence of similar remedies at law," Jones v. Carpenter, 90 Fla. 407, 106 So. 127, 128 (1925), exist "independently of any special agreement" and are enforceable "on the principle that one person, having gotten control of an estate of another, ought not in conscience to keep it, as between them, without making due compensation," Hillman, 179 So. at 809, the logic undergirding an equitable lien would be extinguished if a sum certain were the vital element testified to by Paparone's witnesses. The unliquidated nature of LPHC's claims was a negative element affecting recovery under any theory. If, however, LPHC could have obtained a judgment for breach of contract, it may nonetheless have been entitled to a lien on the land by virtue of equitable considerations. The understandings and commitments expressed in the PPA describe a setting in which LPHC had passed title to and possession of its property to Placid Lakes but with only a naked expectation that it would in the future receive a full measure of benefit from the bargain. In that circumstance, the vendor's lien was particularly appropriate and bears none of the indicia of the invidious purpose ascribed to it by Paparone.
There is no evidence, as was determined in Paparone III, indicating that the Bankers group by acceding to the reconveyance in the place of foreclosure of the vendor's lien participated in the formulation or execution of a scheme designed to forestall the exchange of money. Bankers was willing to absorb its losses and be rid of the property as long as it did not have a residual liability. More significantly, however, the evidence relied upon by Paparone to bootstrap the inference that Tobler and, vicariously, LPHC, masterminded a plan to bypass Paparone's commission derives in substantial part from letters or documents prepared not just by LPHC's attorneys, but by Bankers' attorney as well.
Early in the dispute between LPHC and the Bankers group, LPHC's attorney rendered an opinion letter generally stating that if funds contemplated by a land contract are not realized, or if the land is reconveyed, the broker would not be entitled to a commission. To bolster the contention that she was defrauded of a commission in violation of fiducial obligations, Paparone couples that opinion with and lays great stress upon a subsequent memorandum to the file prepared by one of the attorneys for Tobler and LPHC in which the comment is found "I suggested to Mr. Tobler that there was some basis for a suit by [Paparone] but that we could only structure the transactions as best we could to avoid her successful prosecution of a suit." We have serious difficulty sanctioning the conversion of an attorney's professional commitment to protect a client through artful effort into the basis for a claim of fraud. We are absolutely unwilling, as the trial court should have been, to transform an attorney's legitimate purpose in seeking to reduce a client's jeopardy into evidence of a distinguishable and independent tort. See Southern Bell Telephone & Telegraph Co. v. Hanft, 436 So.2d 40 (Fla. 1983).
In a similar vein, the Bankers group's attorney announced in a letter his awareness that Paparone was asserting a 50% interest in that portion of the profits to which LPHC was entitled. Later that month the attorney for the Bankers group offered, inter alia, to re-deed the property to LPHC if Paparone would execute a release. In further communications, the Bankers group adhered to the settlement offer conditioned upon a release from Paparone. The ultimate compromise, of course, did not embody a release from Paparone. Rather, LPHC indemnified and agreed to defend the Bankers group from actions relating to the settlement. On the very day that the settlement was executed, it was Bankers' attorney who wrote to the attorney for Tobler and LPHC noting the *379 Paparone threat to sue and proposed a defensive stratagem to be followed in reacting to her litigation threat. It cannot be said that LPHC's adoption of the litigating techniques proposed by Bankers' attorney's can either be equated with or properly become evidence of a fraudulent design. The skillful utilization of procedural and substantive rules, generating an advantage in the representation of a client, is hardly a basis for the result reached in this matter.
In sum, we are convinced from a totality of Paparone's evidence that she failed in her breach of contract action to adduce evidence satisfying the elevated standard essential to the recovery of punitive damages.
Accordingly, we vacate the findings of fraud and breach of fiduciary duty, reverse the punitive damage awards and in all other respects affirm the final judgment.
CAMPBELL, A.C.J., and GRIMES, STEPHEN H., Associate Judge, concur.
NOTES
[1] The MacArthur Foundation owns all of the stock in Bankers. Gulfstream Citrus, Inc., Placid Lakes Corporation and Magna Properties, Inc., are affiliates or subsidiaries of Bankers Life and Casualty Company. When we refer in the opinion only to Bankers, we are also referring to its affiliated entities, Placid Lakes and Magna.
[2] In Paparone III we exonerated Bankers from any liability to Paparone on the ground that it had no obligation to her which it had breached and determined that Bankers was free in its best interest to resolve and settle the claim asserted against it by LPHC.